**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

ALISHA PODKOVICH,

        Plaintiff,

vs.

GLAZER'S DISTRIBUTORS OF
IOWA, INC., GLAZER'S
WHOLESALE DRUG CO., INC.,
DOUGLAS HOWELL, and MICHAEL
COFFMAN,

        Defendants.

No. C04-4104-MWB

**MEMORANDUM ORDER AND**
**OPINION REGARDING**
**DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

————————————

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *1.  Undisputed Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *2.  Disputed Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *B.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *A.  Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . 11
    *B.  Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *1.  The defendants' argument in support of summary*
           *judgment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *2.  The plaintiff's arguments in resistance* . . . . . . . . . . . . . . 18
    *C.  Eligibility To Bring FMLA Claim* . . . . . . . . . . . . . . . . . . . . . . . 22
        *1.  Definition of "worksite"* . . . . . . . . . . . . . . . . . . . . . . . . . 23
        *2.  Estoppel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    *D.  The Substantive FMLA Claims* . . . . . . . . . . . . . . . . . . . . . . . . . 29

        **1.**       **FMLA claims generally** . . . . . . . . . . . . . . . . . . . . . . . . . 29

        **2.**       **Podkovich's interference claim** . . . . . . . . . . . . . . . . . . 30

               **a.**      **Defendants' proffered lawful reason** . . . . . . . . . . . 32

               **b.**      **Failure to return after exhausting FMLA leave** . . . . . 34

        **3.**       **Podkovich's discrimination claim** . . . . . . . . . . . . . . . . . 36

               **a.**      **Prima facie case and causation** . . . . . . . . . . . . . . . . 37

               **b.**      **Glazer's legitimate reason** . . . . . . . . . . . . . . . . . . . 40

               **c.**      **Pretext** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    **E.**  **Podkovich's Title VII and ICRA Retaliation Claims** . . . . . . . . . . . . 44

        **1.**       **Federal and Iowa law claims** . . . . . . . . . . . . . . . . . . . . . 44

        **2.**       **The retaliation claims** . . . . . . . . . . . . . . . . . . . . . . . . . 45

               **a.**      **Prima facie case and causation** . . . . . . . . . . . . . . . . 48

               **b.**      **Pretext** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    **F.**  **Podkovich's Pregnancy Discrimination Claim** . . . . . . . . . . . . . . . . 51

        **1.**       **Prima facie case and causation** . . . . . . . . . . . . . . . . . . . 52

        **2.**       **Pretext** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

I n February of 2005, the U.S. Surgeon General issued an Advisory on Alcohol Use in Pregnancy to raise public awareness about this important health concern.■[1] Although the Surgeon General's Advisory primarily is concerned with alcohol exposure and birth defects, this controversy, which involves, in part, a former employee's allegations of pregnancy and sex discrimination against a distributor/wholesaler of alcoholic beverages presents an ironic twist on the Surgeon General's warning against the combination of pregnancy and alcohol, presumably, however, not precisely in the way the

---

[1] *See United States Department of Heath & Human Services*, News Release, U.S. Surgeon General Releases Advisory on Alcohol Use in Pregnancy (Feb. 21, 2005), *available at* http://www.hhs.gov/surgeongeneral/pressreleases/sg02222005.html.

Surgeon General envisioned.

More specifically, the plaintiff asserts her former employer violated the Family and Medical Leave Act (hereinafter, "FMLA") by failing to restore her to her position after she took leave, due to complications with her pregnancy, and by discharging her in retaliation for taking leave. Additionally, the plaintiff asserts allegations of sex and pregnancy discrimination against her employer under Title VII, averring she was discharged in retaliation for complaining about sexual harassment and, or alternatively, for being pregnant. As is typical in these types of cases, the parties dispute not only the ultimate outcome, but also the pertinent factual underpinnings of the case.

## I. INTRODUCTION

### A. Factual Background

The core undisputed facts and sufficient detail of the disputed facts are set forth below to put in context the parties' arguments for and against summary judgment.

### 1. Undisputed Facts

Glazer's is a wholesale distributor and broker of wines, spirits and beer, licensed to operate in the State of Iowa.◻[2]  Under Iowa law, Glazer's is permitted to act in a wholesale distributor capacity only with respect to beer and wine. Regarding spirits, contrarily, Glazer's acts merely as a broker between the supplier and retailer and essentially markets its supplier's products to assigned retail accounts within a specific geographic area.

In February of 2002, Podkovich began working at Glazer's in the capacity of a

---

[2]In the industry, the term "spirits" is used to describe alcoholic beverages other than beer and wine, i.e. hard liquor.

spirit sales representative/broker[3] at Glazer's Sioux City branch. At the time Podkovich was hired, Glazer's employed five spirit sales representatives throughout Iowa. As part of her duties, Podkovich traveled throughout western Iowa, including the Sioux City and Council Bluffs regions, visiting accounts to market spirits. During her tenure at Glazer's, Mike Coffman directly supervised Podkovich. Coffman worked out of Glazer's Des Moines location, and accordingly, Podkovich's sales area and contacts were assigned by the Des Moines office. Although Podkovich made all of her reports to the Des Moines office, usually by facsimile, she spent little time in Des Moines. On average, Podkovich traveled to Des Moines approximately less than once a month. However, she did maintain a mailbox at Glazer's Des Moines location. In addition, she attended training and sales meetings in Des Moines, in addition to orientation. In contrast, Podkovich utilized the Sioux City office approximately once per week. Podkovich was allowed to use an open desk and telephone in the Sioux City location, as well as a storage space in which she stored display cases and product materials and promotional items. The storage area was locked and in order to access her items, Podkovich would have to requisition a Sioux City employee to open the area. From 2001 to 2003, Glazer's employed less than fifty total employees at the Sioux City branch location.

In September of 2002, Podkovich made a complaint regarding inappropriate emails containing sexual references that she received from a Glazer's supervisory employee named Dan Wanderscheid. Wanderscheid worked at the Sioux City branch office. Podkovich, in accordance with Glazer's anti-harassment policy, complained to Larry

---

[3]The spirit sales representative/broker essentially markets Glazer's supplier's products to assigned retail accounts within a specific geographic area. As part of their duties, the spirit sales representatives are responsible for setting up displays in stores. Glazer's receives a brokerage commission that is paid by the targeted suppliers.

Rubida, the Sioux City branch manager. Following an investigation of Podkovich's complaint, Glazer's gave Wanderscheid the choice of either resigning or being terminated. Wanderschied opted to resign. In exchange for his voluntary resignation, Wanderscheid received a severance package from Glazer's. Glazer's did not tell the remainder of their employees about Podkovich's complaint. Rather, the company informed its employees merely that Wanderscheid left the company to pursue other interests.

Months after the incident with Wanderschied, Podkovich became pregnant. Due to certain complications with her pregnancy, Podkovich took four weeks off of work from March 1, 2003, to April 1, 2003. Podkovich filled out a leave request requesting "Family/Medical Leave." Later, in August of 2003, Podkovich again took medical leave due to continued complications with her pregnancy. Prior to this second leave of absence, Coffman wrote Podkovich up on several occasions in July and August of 2003. Specifically, Podkovich was written up once on July 10, 2003. Prior to the current litigation, Podkovich did not receive a copy of this write up even though it was placed in her file. Later, Coffman again wrote two separate write ups critiquing Podkovich's performance both of which were dated August 15, 2003. The August write ups were mailed to Podkovich while she was on leave.

In the midst of these events, Glazer's began negotiating with a company that supplied spirits named Diageo. Glazer's sought to establish an arrangement to exclusively broker Diageo's brands of spirits in Iowa. Glazer's had previously negotiated exclusive distributorship arrangements with Diageo in Texas, Louisiana and Arkansas. In the summer of 2003, Doug Howell, the president of Glazer's at the time, prepared a proposal for Diageo. The initial proposal was premised upon Diageo paying Glazer's a total commission level that would cover a staff of eight spirit sales representatives throughout Iowa. This initial proposal anticipated that Podkovich would staff the Diageo broker

position in Sioux City. However, Howell's initial proposal was rejected by Diageo. Diageo's counterproposal included a commission level that would only support four spirit sales representatives/brokers. Thus, Howell needed to assess which of the five existing brokerage positions would be eliminated. Ultimately, Glazer's restructured its operations and eliminated Podkovich's position. Podkovich was not informed of this arrangement at that time.

Podkovich attempted to return to work during the first week of November of 2003. She tried to make arrangements for her return to work, but she could not elicit a response from Coffman. Finally, Podkovich was advised by Amy Burgess that Howell needed to meet with her in Des Moines, but that the meeting would not be until the week after Podkovich's leave had ended. On November 11, 2003, Podkovich contacted Rusty Harmount, who worked in human resources at Glazer's Texas office to explain the issues she was having in working with the Des Moines office to coordinate her return. The following day, Podkovich drove to Des Moines to meet with Howell. Howell informed Podkovich her position had been eliminated and offered her a severance package. Podkovich declined Glazer's offer. After Podkovich left the office, Glazer's later telephoned her and demanded she provide the company with a doctor's work release when she returned the signed severance package. Thereafter, Podkovich filed for unemployment, which Glazer's immediately contested.

### 2. *Disputed Facts*

Myriad facts are disputed by the parties. First, the parties dispute the nature and quality of Podkovich's contacts with the Sioux City branch office. For example, Glazer's contends Podkovich went to the Sioux City office once a week to perform the office-related tasks of her job. Glazer's contends Podkovich regularly utilized the Sioux City branch office's fax machine to fax her reports to the Des Moines office. Although Podkovich

admits she went to the Sioux City office approximately once a week, she denies she went there to perform the office-related tasks of her job. Rather, Podkovich contends she would usually fax reports to her supervisor at the Des Moines office using a relative's fax machine and only on occasion utilized the Sioux City branch office to perform the office-related tasks of her job. Podkovich admits that she was allowed to use an open desk in the Sioux City office but argues that she did not have anything on the desk to indicate it was hers and that she usually only sat there if she needed to use the telephone. Additionally, Podkovich claims the desk was only made available to her for a limited time. A few months after she started work at Glazer's, the Sioux City location reorganized and another employee took the desk Podkovich had been using. After her desk was removed, Podkovich claims she also no longer had a voice mail through the Sioux City office, and that thereafter, she called the Des Moines office's 1-800 number to check her voice mails.

Second, the parties dispute certain facts surrounding Podkovich's sexual and pregnancy discrimination allegations. With respect to her sexual discrimination complaint, Podkovich contends that, after the investigation into her complaint about Wanderscheid, she was treated negatively. In addition, she claims that Howell and Rubida both made threats to her that if word got out about her complaint of sexual harassment and the actual reason for Wanderscheid's departure, she would be fired. Podkovich avers this same threat was communicated to her boyfriend, Dustin Allen. Glazer's denies any such threats were made in connection with the investigation into Wanderscheid's conduct. In addition, Podkovich contends that after she returned home following the meeting in Des Moines in which she was terminated, she learned that it had become common knowledge at the Sioux City location that Wanderscheid was forced to leave the company as a direct result of her sexual harassment complaint.

With respect to her pregnancy discrimination claim, Podkovich contends that as her

pregnancy progressed, Coffman, her supervisor, began treating her differently. For instance, Podkovich avers Coffman inquired about the due date of her pregnancy and her expected availability for the holidays, which typically was a busy time for the company and coincided with her anticipated delivery. Podkovich contends Coffman made statements suggesting that regardless of her due date, she needed to be available for the holiday show. Thereafter, Podkovich asserts that Coffman became critical of Podkovich's work and did not assist her with tasks that he had previously helped her with. Consequently, Podkovich was forced to complete two physically demanding store resets in August of 2003 on her own, when previosuly Coffman had assisted her or assigned others to provide assistance to Podkovich. Not surprisingly, Glazer's denies, outright, the occurrence of these events. Although Glazer's does admit that Podkovich executed two store resets on her own, it denies that those resets can be characterized as more physically demanding than any other.

Moreover, the parties dispute the occurrence of certain events surrounding Podkovich's attempt to return to work. First, Podkovich contends that while she filled out and received paperwork with respect to her first period of FMLA leave, she did not fill out or receive any documentation from Glazer's regarding her second and final FMLA leave period. In addition, Podkovich claims that following her leave in August, Coffman refused to take her phone calls and further refused to return her calls. Further, Podkovich contends that Dorothy Crisostomo and Cynthia Davenport, two of Glazer's representatives at the company's headquarters in Texas, had informed Podkovich that her return to work date based on her allotted FMLA leave was November 7, 2003. Based on this information, Podkovich believed the totality of her leave was covered and that is why she did not attempt to make arrangements for her return to work until the first week of November. Podkovich further avers that after she attempted to return to work in November of 2003, she received a call from Howell on November 11, 2003, shortly after

she spoke with Harmount from Glazer's headquarters on that same day. Podkovich alleges Howell was rude and hostile throughout the conversation and that he represented he was upset by the fact that Podkovich had complained to Harmount. Near the end of Howell and Podkovich's conversation, Howell informed her she had been eliminated from her job and that she needed to come to Des Moines to sign paperwork related to her termination and to discuss a severance package. The next day, at the meeting with Howell, Podkovich contends he continued behaving in a rude and hostile manner. He demanded she sign the severance agreement immediately and indicated that if she did, Glazer's would not contest or refuse her unemployment. Podkovich further asserts that she requested information about why she was being terminated. In response, she contends Howell simply told her she no longer had a job and failed to mention anything about the Diageo negotiations and subsequent restructuring of the spirit sales representative/brokers positions. Moreover, Podkovich claims she inquired as to why Coffman would not return or answer her telephone calls. She contends she was advised that Hoffman told Coffman not to have any contact with Podkovich. Although the parties agree that Howell mentioned that Podkovich might be able to relocate, Podkovich further avers his subsequent comments made it apparent that Podkovich would have to pick up and transfer to a distant location immediately.

In contrast, Glazer's contends that Podkovich received leave paperwork for both periods of her FMLA leave and that her FMLA leave expired nearly one month prior to the date Podkovich attempted to return to work. Moreover, Glazer's argues that Coffman did take phone calls from Podkovich while she was on leave and disputes the contention that Howell advised Coffman not to take Podkovich's calls. Further, Glazer's denies Podkovich's claims that she recieved a phone call from Howell on November 11, 2003, in which he informed her her position had been eliminated. Rather, Glazer's asserts the

first time Podkovich was informed her position had been eliminated was on November 12, 2003, at the meeting that occurred at the Des Moines office. Glazer's also refutes Podkovich's contentions that Howell behaved in a rude and hostile manner toward Podkovich, demanded she sign the severance agreement and represented Glazer's would not contest her unemployment if she accepted the severance agreement. Glazer's admits that Podkovich requested information about why she was being terminated, but in contrast to Podkovich's rendition of the facts, indicates Howell thoroughly explained the impact that the Diageo contract had on her position. Further, Glazer's denies Podkovich's version of the facts with respect to the position that was offered to her. Rather, Glazer's simply contends that Howell offered Podkovich another position, albeit conditioned on her willingness to relocate to Cedar Rapids, Iowa.

## B. *Procedural Background*

On October 15, 2004, Podkovich filed a three-count complaint in this court against Glazer's Distributors of Iowa, Inc., Glazer's Wholesale Drug Co., Inc., Douglas Howell and Michael Coffman, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et. seq.* (hereinafter "Title VII"), as amended by the Pregnancy Discrimination Act (hereinafter "PDA"); the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et. seq.* (hereinafter "FMLA"); and the Iowa Civil Rights Act, Iowa Chapter 216 (hereinafter "ICRA"). More specifically, in Count I, Podkovich asserts claims of sex and pregnancy discrimination against Glazer's Distributors of Iowa, Inc. and Glazer's Wholesale Drug Co., Inc. In addition, Count I asserts the previously-named defendants retaliated against Podkovich for reporting the sexual harassment and discrimination. In Count II, Podkovich asserts certain violations of the FMLA. Particularly relevant to the current motion is the plaintiff's claim that the defendants

refused to restore the plaintiff to her job or an equivalent position upon the expiration of her FMLA leave.  Count III mirrors the allegations set forth in Count I, asserting claims of sex and pregnancy discrimination, but  pleads these facts as state-law claims under the ICRA.

Following the filing of the plaintiff's initial complaint, on December 13, 2004, the defendants filed an answer, generally denying the plaintiffs' allegations and asserting myriad affirmative defenses (Doc. No. 3).  Thereafter, on May 26, 2006, the defendants filed the current Motion for Summary Judgment (Doc. No. 22).  The plaintiff filed her Resistance to the defendants' Motion for Summary Judgment on June 30, 2006 (Doc. No. 25).  The defendants filed their Reply to the Plaintiff's Resistance on July 18, 2006 (Doc. No. 30).  Neither party requested oral argument on the Motion for Summary Judgment. Therefore, the court deems the defendants' Motion for Summary Judgment as fully submitted on the parties' written submissions.  Accordingly, this matter is ready for a determination by this court.

## II.  LEGAL ANALYSIS

The court will now turn its attention to a brief survey of the standards applicable to the defendants' Motion for Summary Judgment, and then to the application of those standards to the critical issues involved in this case.

### A.  Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment.  Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party.  *Fed. R. Civ. P.* 56(b).  "The judgment

sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for

trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "Because discrimination cases often turn on inferences rather than on direct evidence . . . ." *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch.*

*Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)). The court will apply these standards to the defendants' Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." Oliver Wendell Holmes, *The Common Law* 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII—than during Title VII's earlier evolution, and a dozen years after the passage of the FMLA, both of which are at issue here. Today's employers, even those

with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

## B. Arguments Of The Parties

### 1. The defendants' argument in support of summary judgment

In their Motion for Summary Judgment, the defendants attack nearly every aspect of the plaintiff's complaint. First, with respect to the plaintiff's claims under the FMLA, the defendants contend Podkovich was not eligible for FMLA leave, and therefore, is precluded from bringing such a claim. The defendants point out, that as a threshold matter, even if an employee meets all the prerequisites in order to be eligible for coverage under the statute, that employee may be excluded from eligibility if she was "employed at

a worksite at which the employer employs less than 50 employees and the total number of employees within 75 miles of that worksite is less than 50." 29 U.S.C. §§ 2611(2)(a), 2611(2)(b)(1).◘[4]  With respect to Podkovich, the defendants contend that, under the FMLA and corresponding guidance, Podkovich's worksite was Sioux City and that there is no dispute Glazer's employed less than fifty employees within seventy-five miles of Sioux City.  The defendants contend that if Podkovich's worksite is defined as anywhere but Sioux City, Congress's purpose underlying the 50/75 provision will be undermined, and that summary judgment is warranted on this ground.  Moreover, the defendants claim Podkovich is precluded from relying on a theory of equitable estoppel because she is unable to set forth facts sufficient to demonstrate detrimental reliance on any statements by Glazer's that her leave was covered and protected by the FMLA.

In the alternative, if the merits of Podkovich's FMLA claims are reached, the defendants argue that her claims still must fail because her position was eliminated.  The defendants point out that as long as an employer can show a lawful reason for not restoring an employee on FMLA leave to her position, the employer is justified in its actions.  Thus, argue the defendants, because Podkovich's position was legitimately eliminated based on the negotiations with Diageo, her claim necessarily fails and summary judgment is warranted.  In addition, the defendants aver that Podkovich's FMLA claims fail on the merits for a second reason—namely, that she failed to return to work after exhausting her twelve weeks of FMLA leave.  The defendants contend that Podkovich's twelve weeks of FMLA leave ended on October 10, 2003, but that Podkovich did not return to work until November 7, 2003.  Thus, because Podkovich did not return from her leave within twelve

---

[4]This provision is commonly referred to as the "50/75" provision. *See Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140, 1150 (10th Cir. 2004), *cert. denied*, 126 S. Ct. 356 (2005).

weeks, the defendants argue she had no right to reinstatement or any other remedy available under the FMLA. Additionally, the defendants claim that, once again, Podkovich cannot rely on a theory of estoppel because she cannot prove detrimental reliance on Glazer's assertions that her leave lasted until November 7, 2003, because she was incapacitated and could not return to work, regardless of the length, or lack thereof, of her FMLA leave.

Moreover, with respect to Podkovich's claim that she was discharged because she took FMLA leave, the defendants argue Podkovich cannot establish a prima facie case of retaliation. This is so, aver the defendants, because she cannot establish a causal connection between her FMLA leave and her subsequent termination. At best, the only evidence tending to establish a causal link is the temporal proximity between Podkovich's FMLA leave and her termination. This, state the defendants, is not enough to survive a motion for summary judgment. In the alternative, assuming Podkovich can establish a prima facie case, under the burden-shifting analysis applied to such claims, the defendants allege they have articulated a nondiscriminatory reason for her discharge and that she cannot demonstrate Glazer's stated reason is pretextual in nature. As such, the defendants argue that summary judgment is warranted on all aspects of Podkovich's FMLA claim.

With respect to Podkovich's claim that she was retaliated against for making a complaint of sexual harassment, the defendants contend summary judgment is warranted on both Podkovich's claim under Title VII and her claim under the ICRA. The defendants argue Podkovich's claims of retaliation fail for the same reasons that her FMLA retaliation claim fails. Specifically, the defendants contend Podkovich cannot establish a prima facie case of retaliation because she cannot assert sufficient facts demonstrating a causal nexus between her discharge and her complaint of sexual harassment. Additionally, the defendants again contend they have set forth a legitimate, nondiscriminatory reason for

Podkovich's discharge and that she cannot sufficiently prove pretext. As such, the defendants argue summary judgment is appropriate. The defendants assert these same arguments with respect to Podkovich's pregnancy discrimination claim, and argue summary judgment should be granted on that claim as well.

### 2. *The plaintiff's arguments in resistance*◻[5]

Predictably, the plaintiff contends there is a genuine issue of material fact as to whether she was eligible for FMLA leave and therefore, entitled to bring a claim under the FMLA. First, the plaintiff argues her worksite, for the purposes of FMLA leave was in Des Moines, not the Sioux City branch location, as the defendants contend. This is so, according to Podkovich, because the Code of Federal Regulations indicates that when an employee has no fixed worksite, for FMLA purposes, the worksite is construed to be the office to which the employee reports and receives assignments. In Podkovich's case, the majority of her assignments and reports came from and were sent to the Des Moines office. Because more than 75 people were employed at the Des Moines site, Podkovich contends there is no question that she was eligible for FMLA leave. Alternatively, Podkovich avers that the defendants are estopped from asserting she was not eligible for FMLA leave. Podkovich argues Glazer's represented to her, on numerous occasions, that

---

[5]The defendants point out that the plaintiff's resistance exceeds the applicable page limitations by over eighteen pages. Because the plaintiff failed to file a motion requesting to exceed the page limit, the defendant argues the court should disregard and/or strike the over length portions of the plaintiff's brief from consideration. Although technically, the court could take such action, in the interest of justice, the court will consider the entirety of the plaintiff's brief. The court notes it is somewhat disingenuous of the defendants to ask the court to strike the over length pages of the plaintiff's brief from its purview, particularly in light of the fact the defendants challenged nearly every aspect of the plaintiff's claims. However, counsel for the plaintiff is reminded that in the future, a motion requesting to exceed the applicable page limit is required.

she was qualified to take FMLA leave and eligible for FMLA benefits. Because she detrimentally relied on these representations, Podkovich avers the defendants are estopped from asserting ineligibility as an affirmative defense. Thus, the plaintiff argues there is a genuine issue of material fact as to whether she was eligible for FMLA leave or whether the defendants are estopped from challenging as such. Accordingly, Podkovich contends summary judgment is precluded.

Podkovich also challenges the defendants' argument that because she used more than twelve weeks of leave, Glazer's was under no obligation to reinstate her. Podkovich essentially relies again on an equitable estoppel theory, asserting that she was repeatedly told her FMLA leave expired on November 7, 2003, by Glazer's representatives. In addition, Podkovich argues she never filled out or received a copy of the leave form filed for her second term of leave. Thus, she contends she was not provided with the requisite written documentation designating her leave as FMLA. Additionally, Podkovich asserts that she detrimentally relied on the date provided by Glazer's and even though she was sick, asserts she could have attempted to return to work or made different arrangements if she had known the date was incorrect.

Further, Podkovich argues she has adequately set forth a prima facie case of an FMLA substantive violation. With respect to the causal connection between her termination and the exercise of her rights, Podkovich argues that the temporal proximity of her return from FMLA leave and her immediate termination sufficiently demonstrate a causal link. This is so, according to Podkovich, in light of the fact she was terminated immediately after she sought to return to work after her FMLA leave had expired. In addition, Podkovich asserts she has generated a genuine issue of material fact with respect to the pretextual nature of Glazer's asserted nondiscriminatory reason because the Diageo negotiations concluded nearly two months before she attempted to return back to work.

Under this premise, Glazer's had no continued obligation to provide her with continued FMLA leave and group health coverage, but did so anyway. Podkovich argues these facts create a sufficient inference of pretext because they tend to show that the Diageo contract was not the real reason behind Glazer's decision to terminate Podkovich. Additionally, Podkovich points to the fact that although she was allegedly terminated two months before her leave expired, she was not advised of this decision until she attempted to return to work. Because Glazer's waited two months before advising her of termination, Podkovich contends the Diageo deal was not the true reason for her termination and that Glazer's was simply lying in wait to terminate her. Podkovich additionally asserts that further indicia of pretext is the fact that Coffman refused to return her telephone calls while she was on FMLA leave and that at the meeting held in Des Moines, when she inquired as to why she was being terminated, no one mentioned the Diageo deal, only that her position had been eliminated. These factors, according to Podkovich, generate a genuine issue of material fact with respect to the existence of causation and pretext.

With respect to her retaliation claims under Title VII and the ICRA, Podkovich contends a genuine issue of material fact exists as to whether she was discharged in retaliation for complaining about sexual harassment, thereby precluding summary judgment on these claims. While the defendants argue the amount of time that elapsed from the timing of Podkovich's complaint and the date she was terminated negate any inference of causation and pretext, Podkovich disagrees based on the alleged threat that was communicated to both her and her boyfriend. Essentially, taking the facts in a light most favorable to her, Podkovich contends both she and her boyfriend were told they would be fired if word got out about the true reason Wanderscheid left the company. In addition, she avers that she was treated negatively after she made the report. Finally, on the same date she was terminated, it was revealed to her boyfriend that it had become common

knowledge amongst Glazer's employees that Wanderscheid left the company as a result of Podkovich's sexual harassment complaint. These facts, according to Podkovich, are sufficient to generate a question of fact with respect to the causation and pretext elements.

Finally, with respect to her pregnancy discrimination claim, Podkovich again argues there is sufficient evidence in the record to defeat a motion for summary judgment. She argues that, taking the facts in a light most favorable to her, causation and pretext have been established. First, she points to the temporal proximity between her termination and her pregnancy. Additionally, she contends that Coffman, her supervisor, inquired about her due date and made statements suggesting that Podkovich needed to be available for the holiday show, even though it closely coincided with her predicted date of delivery. Further, Podkovich relies on her allegations that Coffman treated her differently after learning she was pregnant. For example, Podkovich argues that Coffman refused to assist her with physically demanding and strenuous work like he had when Podkovich had not been pregnant. Moreover, Podkovich notes that Coffman became increasingly critical of her performance after learning of her pregnancy and began writing her up for performance issues as she progressed in her pregnancy. Prior to when she was out on leave, Podkovich never received a write-up from Coffman. Further, Podkovich points to her assertions that after she took leave for the second time in August, Coffman refused to return any of her phone calls, even though she had been advised to call and check in on a weekly basis. Podkovich argues these facts are sufficient to generate a genuine issue of material fact with respect to the issues of causation and pretext and that, therefore, summary judgment on her pregnancy discrimination claim is inappropriate as a result.

Having identified all of the pertinent undisputed and disputed facts, the court will now proceed to address the merits of the parties' respective arguments. However, a brief overview of the FMLA is first necessary in order to facilitate the court's discussion.

## C.  Eligibility To Bring FMLA Claim

The FMLA was enacted, in part, "to balance the demands of the workplace with the needs of families . . . [and] to entitle employees to take reasonable leave for medical reasons . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b).  The Act entitles eligible employees of covered employers to take up to twelve weeks of unpaid, job-protected leave each year because of, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D).  As part of the balance Congress struck between the interests of employers and the interests of employees, the FMLA includes a small employer exception that excludes from the Act's coverage employers with fewer than fifty employees.  *Id.* § 2611(4)(A)(i).  A separate exception was granted for small operations—that is, a potentially large company with a relatively small satellite office in a particular area.  Specifically, the statute excludes from coverage any employee whose employer employs less than fifty employees within seventy-five miles of that employee's "worksite." *Id.* § 2611(2)(B)(ii).  According to the House Committee Report, the 50/75 provision "recognizes the difficulties an employer may have in reassigning workers to geographically separate facilities." *H.R. Rep.* No. 102-135(I), at 37 (1991).  "Where a plaintiff does not qualify as an 'eligible employee,' the court lacks jurisdiction to decide the FMLA case." *Humenny v. Genex Corp.,* 390 F.3d 901, 904 (6th Cir. 2004). It is the plaintiff who bears the burden of showing the existence of an FMLA claim.  *Morrison v. Amway Corp.,* 323 F.3d 920, 930 (11th Cir. 2003).  With these eligibility restrictions, Congress recognized that only about 40 to 50 percent of all employees would be covered by the Act.  *S. Rep.* No. 102-68, at 24 (1991); *H.R. Rep.* No. 102-135(I), at 37 (1991).

## 1.    Definition of "worksite"

Congress granted the Secretary of Labor the authority to prescribe such regulations as are necessary to carry out the FMLA.  29 U.S.C. § 2654.  Based on the Secretary's guidance, an employee's worksite is ordinarily the location to which the employee reports. 29 C.F.R. § 825.111(a).  In cases where there is no such identifiable report site, then the location designated as the employee's worksite is the site from which the employee's work is assigned." 29 C.F.R. § 825.111(a).  The regulation proceeds to clarify the "worksite" of an employee with "no fixed worksite," such as salespersons, as the office the salesperson reports to and from which assignments are made.  *See* 29 U.S.C. § 825.111(a)(2).  The assignment test has been determined to focus on the "day-to-day instructions received by the sales representatives, notwithstanding centralized payroll and certain other centralized managerial or personnel functions." *Cialini v. Nilfisk-Advance Am ., Inc.,*  No. CIV. A. 99-3954, 2000 WL 230215, at *4 (E.D. Pa. Feb. 28, 2000) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.,* 143 F.3d 139, 147 (3d Cir. 1998)).  Central to the reporting element is "the location of the personnel who were primarily responsible for reviewing sales reports and other information sent by the sales representatives, in order to record sales, assess employee performance, develop new sales strategies, and the like." *Id.* at *5 (citing *Ciarlante,* 143 F.3d at 148).  One important caveat contained in the regulations with respect to sales representatives, however, is that "an employee's personal residence is not a worksite in the case of employees such as salespersons who travel a sales territory and who generally leave to work and return from work to their personal residence, or employees who work at home, as under the new concept of flexiplace." *Id.*  In these types of situations, the "worksite" for FMLA purposes is the office to which they report and from which assignments are made.  *Id.*

Courts have applied the Secretary's guidance in varying contexts and arrived at differing results. *Compare Cialini,* 2000 WL 230215, *with Collinsworth v. Earthlink/Onemain, Inc.,* No. Civ.A. 03-2299GTV, 2003 WL 22916461 (D. Kan. Dec. 4, 2003). For example, in *Cialini v. Nilfisk-Advance American, Inc.,* the court granted the defendants' Motion for Summary Judgment based on its conclusion that a foreign employer's North American facility in Pennsylvania was not the "worksite" of outside sales representatives based on the following set of facts. *Cialini,* 2000 WL 230215, at *6. First, instead of reporting to the Pennsylvania facility, the sales representatives reported to one of three regional sales managers located in California and Rhode Island. *Cialini,* 2000 WL 230215, at *1. These regional managers conducted initial interviews with applicants in the field and final interviews were conducted at the Pennsylvania facility. *Id.* Training was held in Pennsylvania, where personnel records were maintained and checks issued. *Id.* Representatives turned in weekly call and expense reports, the originals of which were sent to Pennsylvania for a random cross-sampling by the national sales manager. *Id.* at 2. Copies were forwarded to the regional managers, who reviewed them, tracked each salesperson's progress with leads, set up ride-alongs on a quarterly or trimesterly basis, provided hands-on field training, set yearly budgets and sales targets, and evaluated field performance. *Id.* Regional managers also determined when and whether each representative attended trade shows. *Id.* It was the national sales manager's testimony that regional managers were ultimately responsible for creating assignments and receiving reports from sales representatives. *Id.* at *4. Therefore, the court concluded that the Pennsylvania location was not the salesperson's "worksite" for purposes of the FMLA, primarily because the Pennsylvania location functioned merely as a centralized facility for administration, at least with respect to the employees at issue. *Id.* at *6. Thus, the court granted summary judgment in favor of the defendants. *Id.*

In contrast to, yet reconcilable with, *Cialini* is *Collinsworth v. Earthlink/Onemain, Inc.,* No. Civ.A. 03-2299GTV, 2003 WL 22916461 (D. Kan. Dec. 4, 2003). There, the plaintiff worked for Earthlink both from her home and in its Overland Park, Kansas office. *Collinsworth,* 2003 WL 22916461 at *3. The defendant filed a Motion for Summary Judgment, asserting the plaintiff was ineligible to bring an FMLA claim because Earthlink had never employed more than fifty employees within seventy-five miles of its Overland Park location. *Id.* at 2. In her affidavit in response to the employer's Motion for Summary Judgment, the plaintiff maintained that (1) her work assignments were communicated to her via electronic mail, telephone conference and facsimile from Earthlink's Pasadena, California location; (2) work assignments over a period of time were forwarded to supervisors in Pasadena; (3) she reported to supervisors in California and (4) was required to travel there at intervals to meet with them. *Id.* at *4. Upon review, the court found the existence of a genuine issue of material fact as to whether the plaintiff was an "eligible employee" under the FMLA based on the location of her "worksite," and denied the employer's Motion for Summary Judgment. *Id.* Thus, these two cases reveal that, at least for FMLA purposes, the "worksite" location necessarily will turn upon the facts and circumstances of each individual employee. However, these two illustrative cases can be reconciled by virtue of the fact they both rely on the proposition that in order to be considered as an employee's worksite, the individual's contacts with that location must be based on something more than mere centralized management functions.

Based on the foregoing cases and conclusions, it is the opinion of this court that, taking the facts in a light most favorable to the plaintiff, as this court must, it is apparent that the case at bar is nearly identical to the facts at issue in *Collinsworth*. For instance, although Podkovich's physical worksite was in Sioux City and she had an office available to her there, Podkovich has offered evidence showing that her training, job assignments

and authorizations came from Des Moines. In addition, Podkovich regularly reported to her supervisors in Des Moines, who reviewed her sales and she was required to travel there at intervals in order to meet with her supervisors. Thus, as in *Collinsworth*, Podkovich has brought forth sufficient evidence that raises a genuine issue of material fact as to whether she is an eligible employee under the statute. Therefore, a reasonable fact finder could conclude that the plaintiff's "worksite" for purposes of the FMLA was Des Moines. *See* 29 C.F.R. § 825.111(a)(2); *Collinsworth,* 2003 WL 22916461 at *4. This is true particularly in light of the fact that Podkovich's contacts with the Des Moines location did not occur solely as a result of centralized managerial functions. Accordingly, the defendants' dispositive motion, with respect to this ground, is hereby denied.

### 2.    *Estoppel*

Although the court has previously determined summary judgment is not warranted based on the defendants' argument that Podkovich was not an "eligible employee," the court will proceed to address the plaintiff's alternative argument against summary judgment—that of equitable estoppel. Essentially, the plaintiff argues Glazer's should be equitably estopped from asserting an affirmative defense that Podkovich was not an eligible employee because company representatives and associates repeatedly represented to her that she was not only eligible to apply for, but also to take, FMLA leave. "The principle of [equitable] estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 659 (8th Cir. 1992); *see also Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984) (referring to the Restatement (Second) of Torts to define equitable estoppel as warranted in situations where one person has misrepresented facts and another person

reasonably relies on the misrepresentation to his or her detriment). The doctrine of equitable estoppel has previously been applied to estop employers from asserting an affirmative defense contesting an employee's entitlement to FMLA leave. *See Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 493-94 (8th Cir. 2002) (citing *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 724-25 (2d Cir. 2001) (affirming the district court's decision to estop an employer from asserting an affirmative defense challenging an employee's FMLA eligibility when the employer's unintentional misleading behavior caused the employee to justifiably and detrimentally rely on the FMLA leave); *Woodford v. Cmty. Action of Greene County, Inc.,* 268 F.3d 51, 57 (2d Cir. 2001) (authorizing equitable estoppel where an employer initially provided notice of eligibility for leave and later seeks to challenge it); *Dormeyer v. Comerica Bank-Illinois,* 223 F.3d 579, 582 (7th Cir. 2000) (recognizing a district court's ability to equitably estop employers from asserting an affirmative defense contesting an employee's entitlement to FMLA leave in situations where the employer's words or conduct have misled the employee into relying on the leave)).

In the present case, taking the facts in a light most favorable to the plaintiff, at no time prior to the institution of this lawsuit did Glazer's ever advise Podkovich that she was not eligible for FMLA leave, or even imply that there was uncertainty with respect to her eligibility. Rather, it is clear from the record that Glazer's treated Podkovich, at all times prior to the lawsuit, as an eligible employee. With respect to her first period of FMLA leave that began in March of 2003, Glazer's provided Podkovich with a Leave Request and Response form, which Podkovich used to request FMLA leave. Glazer's then utilized the form to document that Podkovich's leave had been approved and would be counted against her FMLA entitlement. Although Glazer's did not provide, nor did Podkovich fill out documentation for her second term of leave, numerous company representatives, according

to the testimony of Podkovich, represented to her that she was entitled to FMLA leave and advised her as to when her FMLA leave would expire.

Moreover, contrary to the defendants' assertions, there is sufficient evidence in the record to suggest that Podkovich relied on these statements. Not only did she take leave under the guise of being protected by the FMLA in March, months later, she again took what she thought was qualified FMLA leave time. Although the defendants attempt to undermine Podkovich's alleged detrimental reliance by asserting Podkovich would have had to take leave "no matter what," because she was so ill, such an allegation is not sufficient to warrant summary judgment in light of the other facts and circumstances of the case. Simply because Podkovich was arguably too sick to work does not axiomatically disprove detrimental reliance. Rather, it is clear, taking the facts in a light most favorable to Podkovich, that she did rely on the company's representation that she qualified for FMLA leave because she did not look into pursuing other options to secure her leave time. Rather, she assumed her leave was covered and that her position was protected under the FMLA. This is further demonstrated by the fact that Podkovich called in during the first week of November to coordinate her return on November 7, 2003, the date that was provided to her by Glazer's representatives. Thus, these facts, if proved, could lead a reasonable fact finder to conclude that the doctrine of equitable estoppel is appropriate in this case. Thus, summary judgment is also not warranted with respect to Podkovich's FMLA claims on this ground.

### D.  The Substantive FMLA Claims

#### 1.      FMLA claims generally

As mentioned elsewhere in this opinion, the FMLA entitles eligible employees to take a total of twelve weeks of leave during a twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  When an employee completes her FMLA leave, she is generally entitled to be restored to the position she occupied before she took leave. *See* 29 U.S.C. § 2614(a)(1).  However, an employee's restoration rights are limited, such that no employee taking FMLA leave is entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).

Because the FMLA grants valuable leave and restoration rights to eligible employees, it also secures these rights against unlawful infringement.  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1).  A violation of this provision creates what is commonly known as the interference/entitlement theory of recovery.  29 U.S.C. § 2617; *see, e.g., Smith v. Diffee Ford-Lincoln-Mercury, Inc.,* 298 F.3d 955, 960 (10th Cir. 2002).  The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA.  29 U.S.C. § 2615(a)(2).  A violation of this provision creates what is commonly known as the discrimination/retaliation theory of recovery.  29 U.S.C. § 2617; *see, e.g., Smith,* 298 F.3d at 960.

## 2.    *Podkovich's interference claim*

As alluded to in the preceding discussion, the "interference" or "entitlement" theory, which arises from § 2615(a)(1), states that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA]," and from § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position."   29 U.S.C. §§ 2615(a)(1) and 2614(a)(1).   The "interference" or "entitlement" theory "is derived from the FMLA's creation of substantive rights.   Consequently, "[i]f an employer interferes with the FMLA-created right to . . . leave or to reinstatement following the leave, a violation has occurred." *Arban v. West Publ'g Corp.,* 345 F.3d 390, 401 (6th Cir. 2003) (citing *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999)).

To prevail on her interference claim, Podkovich must establish that Glazer's denied her FMLA benefits to which she was entitled.   The FMLA is structured to grant leave rights to qualified employees.   Perhaps even more importantly, however, the FMLA also grants the right to restoration upon completion of the leave. 29 U.S.C. § 2614(a)(1)(A). However, as the Eighth Circuit has recently noted, an employee who takes FMLA leave does not have unlimited restoration rights upon returning from leave.   *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977-78 (8th Cir. 2005).   As mentioned above, the FMLA specifically states an employee taking FMLA leave is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B);   *see also* 29 C.F.R. § 825.216(a) ("An employee has no

greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."). In *Throneberry v. McGehee Desha County Hospital*, the Eighth Circuit thoroughly discussed the appropriate interpretation of the FMLA:

> [T]he FMLA envisions employees taking leave and returning to work as valuable rights working in concert with each other, i.e., the FMLA does not require an employer to retain an employee on FMLA leave if that employee has no right to return to work. The reason is the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation an employee will return to work after the leave ends. Therefore, the FMLA's plain language and structure dictates that, if an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge.
>
> This interpretation also tracks the Department of Labor's interpretation of the FMLA. The Department of Labor, acting under its congressional authority to implement the FMLA, *see* 29 U.S.C. § 2654, permits employers to lawfully interfere with employees' rights to take FMLA leave. For example, the FMLA regulations state, "If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise." 29 C.F.R. § 825.216(a)(1); *see also* 29 C.F.R. § 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee

has no right to restoration to another position under the FMLA."); 29 C.F.R. § 825.216(b) ("If an employee was hired for a specific term or only to perform work on a discrete project, the employer has no obligation to restore the employee if the employment term or project is over and the employer would not otherwise have continued to employ the employee."). *But see* 29 C.F.R. § 825.702 (discussing interaction between the FMLA and the Americans with Disabilities Act (ADA)). However, the regulations make clear that, if an employer chooses to interfere with an employee's FMLA leave rights, the "employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." 29 C.F.R. § 825.216(a)(1). As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights.

*Throneberry*, 403 F.3d at 978-79 (footnote omitted). Under this framework, the court will proceed to discuss the parties' respective arguments with respect to Podkovich's substantive FMLA claims.

### a. *Defendants' proffered lawful reason*

In the case at bar, the defendants contend they were justified to interfere with Podkovich's right to reinstatement under the FMLA because her position was eliminated solely by virtue of the Diageo contract. If these facts were proved at trial, there is no question that Glazer's would have been justified in its actions. However, the problem with the defendants' argument is that other evidence in the record calls Glazer's actions into question, thereby creating a genuine issue of material fact. First, Podkovich contends that although the negotiations with Diageo concluded on September 3, 2003, over two months

prior to her return to work from leave, Glazer's failed to notify her that her position had been eliminated until she spoke with Howell on the telephone on November 11, 2003. In addition, her leave was inexplicably continued, despite the fact that under the FMLA, the employer's responsibility to continue FMLA leave ceases at the time the employee is laid off. 29 C.F.R. § 825.216(a)(1). In addition, even though she was allegedly laid off, Podkovich avers Glazer's continued to maintain her group health insurance coverage and even proceeded to add her son to her plan following his birth, even though he was born *after* the alleged Diageo deal had been finalized. Further, Podkovich contends she was never informed her position had been eliminated based on the Diageo contract. Rather, she contends she was informed she simply did not have a job. Additionally, Podkovich has presented facts suggesting Coffman would not return her phone calls while she was on FMLA leave and that Howell became hostile and angry upon learning she had called Glazer's headquarters in Texas to report her difficulties with returning to work. Finally, in a Wage and Hour Investigation Form that was responded to by Glazer's, the company's statement alleges Podkovich was not eligible for job restoration because her FMLA leave expired before she returned to work, and that had she returned to work within the twelve-week period, although the Sioux City position had been eliminated, "she likely would have been placed into an equivalent sales representative position." Plaintiff's Appendix, Exhibit 8, Wage and Hour Investigation Position Statement, at 16. This document suggests that the Diageo deal had little to do with Podkovich's termination and that ultimately, Glazer's was primarily upset by Podkovich's perceived overutilization of FMLA leave or her pregnancy. These facts are sufficient to generate a genuine issue of material fact with respect to Podkovich's intereference claim because if proved, a reasonable fact finder could conclude that the true reason Podkovich was not restored to her position or placed into an equivalent position was due to the exercise of her FMLA rights. Further, a

reasonable fact finder could conclude that the reason the Sioux City position was selected for elimination, as opposed to one of the remaining spirit sales representative positions, was due to the company's dissatisfaction with Podkovich's exercise of her FMLA rights. In short, summary judgment is not warranted because if the foregoing facts are proved, they would be sufficient to demonstrate interference with Podkovich's FMLA rights.

### b.    *Failure to return after exhausting FMLA leave*

The defendants further contend they were justified in interfering with Podkovich's FMLA rights because she failed to return to work after exhausting her allotted twelve weeks of FMLA leave.  The defendants point to the fact that Podkovich took four weeks of FMLA leave from March to April 2003.  Thus, she only had eight weeks of FMLA leave remaining in August when she took her second round of FMLA leave.  Podkovich's second leave term began on August 19, 2003.  Consequently, the defendants contend any FMLA-qualified leave expired on October 10, 2003.  However, it is undisputed Podkovich did not return to work until the first week of November—nearly a month after her remaining eight weeks of FMLA leave had expired.

The defendants correctly state that if an employee fails to return, prior to, or immediately upon, the expiration of qualified FMLA leave, the right to reinstatement dissipates.  *Hunt v. Rapides Healthcare Sys., L.L.C.*, 277 F.3d 757, 768 (5th Cir. 2001). Further, it is undisputed that Podkovich exercised FMLA leave in excess of the twelve-week statutory period.  Were these the only facts on the record, summary judgment would be warranted.  However, Podkovich again relies on the doctrine of equitable estoppel, contending she has asserted sufficient facts to demonstrate that Glazer's should be equitably estopped from asserting an affirmative defense that Podkovich had exhausted the twelve weeks of FMLA leave to which she was entitled.

In a somewhat comparable case, the Eighth Circuit affirmed a district court's decision to estop an employer from contesting an employee's eligibility under the FMLA under similar circumstances. *See Duty*, 293 F.3d at 493-94. In *Duty v. Norton-Alcoa Proppants*, the employer sent the employee a letter that explicitly guaranteed the employee FMLA leave until December 10, 1997, even though the employee's FMLA leave, in actuality, expired on July 10, 1997. *Id.* The Eighth Circuit held that the employee either did or reasonably could have relied on the employer's specified leave time to his detriment. *Id.* at 494. This inference was based upon the employee's telephone call to his supervisor on December 11, 1997, the day immediately following the end of his FMLA leave as designated by the employer. *Id.* Based on these facts, the Eighth Circuit determined the district court did not err in equitably estopping the employer from contesting the employee's eligibility to assert a claim under the FMLA. *Id.* For the same reasons enunciated in *Duty*, this court agrees. Taking the facts in a light most favorable to the plaintiff, it is apparent that Podkovich was repeatedly told by Glazer's representatives that her FMLA leave would not be exhausted until November 7, 2003. It is clear Podkovich either did or reasonably could have relied on the specified leave time to her detriment. This is particularly true because Podkovich called Glazer's during the first week in November, immediately prior to the termination of her FMLA leave defined by Glazer's, as was the case in *Duty*. Although the defendant contends detrimental reliance cannot be proved because Podkovich's deposition testimony indicates she was too sick to return to work, this argument fails. Had Podkovich known her FMLA leave had expired, she could have opted to pursue other options, for example, leave without pay or perhaps short-term disability leave. The defendants' argument is not sufficient to warrant summary judgment

on these grounds.◻[6]

### 3. *Podkovich's discrimination claim*

Podkovich also asserts a discrimination claim under the FMLA. The "retaliation" or "discrimination" theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Specifically, an employer is "prohibited from discriminating against employees . . . who have used FMLA leave," nor can they "use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c); *see Arban,* 345 F.3d at 403. "An employee can prove FMLA retaliation circumstantially, using a variant

---

[6]Relying on *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002), the defendants argue that the Supreme Court has rejected the argument that an employer's actions can create greater periods of statutorily described leave, implicitly suggesting they cannot be held accountable for their purported misrepresentations to the plaintiff. The defendants' argument is premised upon a misreading of the import of *Ragsdale*. In *Ragsdale*, the Court addressed a DOL regulation that prescribed, in cases where the employer fails to notify the employee the leave taken will be counted against the twelve-week FMLA allotment, the taken leave does not count against the employee's FMLA leave balance, thereby entitling the employee to an additional twelve-week period (regardless of whether the employee incurred any detriment by the employer's silence). The Court found the DOL regulation effectuated an impermissible alteration of the statutory framework and exceeded the Secretary's power "necessary to carry out" the Act. *Id.* at 96. Thus, the problem in *Ragsdale* was that the Secretary did not have the authority to, in essence, change the Act. However, as other courts have pointed out, in contrast with the FMLA's clear eligibility requirements, "there is nothing in the [FMLA] that relates to misleading eligibility notices," particularly in cases where detrimental reliance limits the application of the doctrine to an identifiable and limited number of cases. *See Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 582 (7th Cir. 2000). Thus, *Ragsdale* does not preclude employment of the doctrine of equitable estoppel for the reasons advanced by the defendants and is inapposite to the case at bar.

of the burden shifting test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *McBurney v. Stew Hansens's Dodge City, Inc.,* 398 F.3d 998, 1002 (8th Cir. 2005); *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002). More specifically, "[t]o establish a prima facie case of retaliation, [the plaintiff] must show [1] that he exercised rights afforded by the Act, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between his exercise of rights and the adverse employment action." *McBurney,* 398 F.3d at 1002; *Smith,* 302 F.3d at 832; *Darby v. Bratch,* 287 F.3d 673, 679 (8th Cir. 2002). But, as the Eighth Circuit Court of Appeals has explained, "the *McDonnell Douglas* battle is only begun with the prima facie case. If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual." *Smith,* 302 F.3d at 833. Because Podkovich's proof of causal connection is based on indirect evidence, this court must employ the *McDonnell Douglas* framework. *See Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 315 (6th Cir. 2001).

### a.    *Prima facie case and causation*

It is undisputed that elements one and two of Podkovich's prima facie case are satisfied—Podkovich took FMLA leave, Glazer's was aware of such leave and Podkovich's termination is unquestionably an adverse employment action sufficient to satisfy the second element. What the parties dispute vehemently is whether Podkovich can make the necessary showing on the third element of her prima facie case, that there was "a causal connection between [her] exercise of rights and the adverse employment action." *Id.; Smith,* 302 F.3d at 832; *Darby,* 287 F.3d at 679. As to that third element, in a recent FMLA case, the Eighth Circuit Court of Appeals recognized that "the kind of causal connection required for a prima facie case is not 'but for' causation, but rather, a showing

that an employer's 'retaliatory motive played a part in the adverse employment action.'" *McBurney,* 398 F.3d at 1003 (quoting *Kipp v. Miss. Highway & Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir. 2002)). To show a causal connection, Podkovich again points to the close temporal proximity between her FMLA leave and her termination. The defendants contend this is not enough. This court disagrees.

Although not always dispositive, "the time lapse between an employee's protected activity and the employer's adverse action is an important factor when evaluating whether a causal connection has been established." *Id.* (noting that the court had previously held that a two-month interval between protected activity and termination "diluted any inference of causation," so that the six month interval in the case then before the court was simply too long for the inference of causation to arise); *but see Smith,* 302 F.3d at 832 ("We have discounted, albeit with qualification, the possibility that mere temporal proximity between protected act and adverse employment action can establish the necessary causal connection: 'Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'") (quoting *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc* )). The Eighth Circuit Court of Appeals has explained that the key to determining whether temporal proximity is or is not enough, standing alone, to show "causation" appears to be "the length of time between protected activity and adverse action." *Smith,* 302 F.3d at 833. Thus, "'[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'" *Id.* (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (*per curiam*), with internal quotation marks omitted).

Here, Podkovich contends that she has shown such "very close" temporal proximity, where her termination followed immediately upon the heels of, indeed, just days, after the expiration of her FMLA leave. She points out that the decision to terminate her was made, or at least communicated to her, on November 11, 2003, and that her FMLA leave, at least according to Glazer's representation, expired on November 7, 2005. Podkovich contends, and the court agrees, that a reasonable juror could conclude from such very close temporal proximity that Glazer's was simply waiting for the expiration of Podkovich's FMLA leave to terminate her in retaliation for taking FMLA leave. The Eighth Circuit Court of Appeals has also explained that an "extra quantum of evidence" that may satisfy the causation requirement is "[a] pattern of adverse actions that occur just after protected activity." *Smith,* 302 F.3d at 832. The court reiterated, however, that "even without a pattern, we have sometimes held that the timing of one incident of adverse employment action following protected activity sufficed to establish causal connection," and that the court had so held even after the *en banc* decision in *Kiel,* which suggested that more than mere temporal proximity was required. *Id.* Here, Podkovich's termination is plainly a very serious adverse employment action and was, in this case, sufficiently close in time to the end of her FMLA protection, to generate a genuine issue of material fact on the necessary causal connection. *Id.*

Moreover, even if temporal proximity, standing alone, were insufficient to defeat the defendants' motion, additional evidence supports a nexus between the exercise of her FMLA rights and the adverse employment action. In particular, is Podkovich's allegation that Coffman represented to her that she needed to be available during Glazer's busy season, and his subsequent refusal to return any of Podkovich's telephone calls when she was out on FMLA leave at this critical time. Further bolstering this conclusion, are Podkovich's allegations regarding Howell's rude and hostile treatment after he learned she

had called the Texas office to relay her trouble with returning to work. Therefore, the temporal proximity between the expiration of Podkovich's rights under the FMLA and the adverse employment action of Podkovich's termination, coupled with an extra quantum of evidence alleged by Podkovich does reasonably satisfy the only disputed element of Podkovich's prima facie case of retaliation in violation of the FMLA.

### b. *Glazer's legitimate reason*

At the second stage in the analysis, as in a Title VII or ADEA case, to dispel the inference of discrimination arising from the prima facie showing, the employer must articulate, but need not prove, a legitimate, non-discriminatory reason for its employment decision. *Kinkead v. Southwestern Bell Tel. Co.*, 49 F.3d 454, 456 (8th Cir. 1995); *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089-90 (8th Cir. 1992); *accord Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 330 (1st Cir. 1996). The employer's explanation of its actions must be "clear and reasonably specific," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981), but the employer's burden of production has nonetheless been held to be "exceedingly light." *See, e.g., Nelson*, 335 F. Supp. 2d 944, 961 (N.D. Iowa 2004) (quoting *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)); *see also Jenkins v. Wal-Mart Stores, Inc.*, 910 F. Supp. 1399, 1419 (N.D. Iowa 1995); *accord Kowalski v L & F Prods.*, 82 F.3d 1283, 1289 (3d Cir. 1996) (characterizing employer's burden, albeit in a case involving a claim under § 510 of ERISA, as "relatively light").

In response to Podkovich's prima facie case, Glazer's has asserted, as a legitimate, non-discriminatory ( *i.e.,* non-retaliatory) reason for its decision to terminate Podkovich, that her position was eliminated as a result of the Diageo contract. *See Smith,* 302 F.3d at 833 (if the plaintiff presents a prima facie case, the employer must come forward with

evidence of a legitimate, nondiscriminatory reason for its treatment of the employee). Such an assertion satisfies the light burden on an employer at the second stage of the *McDonnell Douglas* burden-shifting analysis, particularly where the pertinent regulation under the FMLA states that no employee on leave has "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3)(B); *see also Throneberry*, 403 F.3d at 979 (noting that as long as an employer can show a lawful reason, the employer is justified in interfering with an employee's FMLA rights).

### c.    Pretext

As mentioned previously, Glazer's stated legitimate, nondiscriminatory reason for terminating Podkovich is the elimination of her position due to the Diageo contract. "If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual." *Smith,* 302 F.3d at 833. The employee shows pretext by establishing that the employer's "justification for the [adverse action] was unworthy of credence." *Id.* at 833-34. An employee can prove pretext in several ways. *See Morris v. Winnebago Indus., Inc.*, 936 F. Supp. 1509, 1524 (N.D. Iowa 1996) (noting that to show pretext, the employee must "'demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence . . . .'") (quoting *Kowalski*, 82 F.3d at 1289). First, the employee can show that the employer's proffered explanation has no basis in fact. *Logan v. Liberty Healthcare Corp.,* 416 F.3d 877, 881 (8th Cir. 2005). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling

to cover up a discriminatory purpose." *Reeves,* 530 U.S. at 143. Also, the employee can prove pretext by showing that the employer varied from its normal policy or practice to address the employee's situation. *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 727 (8th Cir. 2001). For example, the employee could show that the employer routinely treated similarly situated employees who were not in the protected class more leniently. *Smith,* 302 F.3d at 835. Likewise, the employee could demonstrate that she was discharged pursuant to an inconsistent policy. *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 860 (8th Cir. 2005).

Here, the court finds that Podkovich has pointed to more than adequate evidence to generate genuine issues of material fact that Glazer's proffered explanation is unworthy of credence, suggesting that the proffered reason is a pretext, and that the real reason was retaliation. In short, Podkovich relies on facts previously discussed elsewhere in this opinion—namely, the inexplicable delay in the time it took Glazer's to advise Podkovich that her position had been terminated, the company's decision to continue her FMLA leave for nearly two months after the Diageo deal had been struck; the company's continued coverage of Podkovich under the group health care plan for nearly two months after the alleged termination of her position; the addition of Podkovich's son to her health care coverage, despite the fact he was born after the Diageo deal had been reached; the hostile manner in which she was ultimately informed of her termination; Howell's visible dissatisfaction with Podkovich's telephone call to the Dallas office to report the problems she was having returning to work; the close proximity between her attempt to return to work and her termination; and Coffman's representations that she needed to be present during Glazer's busy season, during which her FMLA leave ultimately took place. Taking these facts as true, this evidence, contends Podkovich and the court agrees, seriously undercuts the credibility of explanations that Podkovich was terminated *solely* as a result

of the Diageo contract.

Undercutting further reliance on Glazer's explanation is the previously-mentioned letter that is authored by Glazer's own attorneys, in response to a Wage and Hour Investigation. The letter, dated January 23, 2004, states, "Podkovich was not eligible for job restoration because her twelve-week allotment of FMLA leave had expired approximately one month before she attempted to return to work." Later, the letter goes on to state that "because she exhausted her leave entitlement weeks before she contacted the Company about returning to work, Glazer's was not required to restore her to the position that she held prior to taking leave." Finally, with respect to Glazer's purported, legitimate, nondiscriminatory reason, the letter acknowledges Glazer's had made the decision to eliminate the Sioux City position Podkovich held. However, the letter further elaborates that "[h]ad she returned to work within the twelve-week period, she likely would have been placed into an equivalent sales representative position." One way to show that the employer's justification is "unworthy of credence," in order to meet the "pretext" prong at this stage of the *McDonnell Douglas* burden-shifting analysis, is to show that there were "[s]ubstantial changes over time in the employer's proffered reason for its employment decision." *Id.* at 835. Thus, now that litigation has commenced, Glazer's argues the only reason Podkovich was eliminated was because of the deal with Diageo. However, months earlier, as the previously mentioned letter suggests, Glazer's indicated Podkovich was terminated for exceeding her twelve-week FMLA allotment. These shifting reasons are further evidence of the pretextual nature of the defendants' purported legitimate, nondiscriminatory reason for terminating Podkovich. In short, the court finds that Podkovich has "present[ed] evidence that creates a question of fact as to whether [the employer's] proffered reason was pretextual." *Smith,* 302 F.3d at 833. Podkovich's evidence of pretext, if believed and when combined with the evidence

supporting the prima facie case, is sufficient evidence from which a reasonable jury could find that Glazer's retaliated against Podkovich for exercising her FMLA rights. Thus, summary judgment, at this juncture, is not appropriate.

### E. Podkovich's Title VII and ICRA Retaliation Claims

In addition to her FMLA claims, Podkovich asserts, in Count II of her Complaint, that she was retaliated against by Glazer's for complaining about sexual harassment. Specifically, she alleges she was fired on November 12, 2003, as the result of the complaints about Wanderscheid's sexually harassing emails to her supervisors. The defendants have also moved for summary judgment on this claim.

#### 1. Federal and Iowa law claims

Before addressing the merits of the parties' respective arguments, it is important to note that the plaintiff premised her claims of retaliation under both federal law pursuant to Title VII and state law, pursuant to the Iowa Civil Rights Act ("ICRA"). This court has previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." *Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)). This is so, because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See id.* at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an

analytical framework for analyzing ICRA claims. *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between Title VII and the ICRA becomes critical, the court will analyze the plaintiff's state and federal retaliation claims together, using federal precedent.

### 2.    *The retaliation claims*

The Eighth Circuit Court of Appeals recently reiterated that, post-*Desert Palace, Inc. v Costa*, 539 U.S. 90 (2003), the courts must still apply the *McDonnell Douglas* three-part burden-shifting analysis to retaliation claims. *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017-18 (8th Cir. 2005) (holding that *Desert Palace* had no impact on the applicability of the burden-shifting analysis to either retaliation or discrimination claims); *see also Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005) (applying the burden-shifting analysis to a retaliation claim); *Kratzer v. Rockwell Collins, Inc*, 398 F.3d 1040, 1048 (8th Cir. 2005) (same). Thus, "[t]o make a prima facie case of retaliation against an employer, a claimant must show that (1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Eliserio*, 398 F.3d at 1078-79; *Kratzer*, 398 F.3d at 1048; *accord Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1035 (8th Cir. 2005) ("To state a retaliation claim, a plaintiff must show that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the two events are causally connected.").

Before discussing the parties' shifting burdens under *McDonnell Douglas* once a prima facie case has been adequately demonstrated, a brief discussion of the second element of the prima facie case in Title VII cases is warranted in light of a very recent

United States Supreme Court opinion—*Burlington Northern & Sante Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006). In *White*, the Court clarified the scope of Title VII's anti-retaliation provision and resolved a circuit split over what types of actions qualify as "adverse employment actions." *See generally Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, (2006). Prior to *White*, some circuits applied the same standard for retaliation that they applied to a substantive discrimination offense, holding that the disputed action must "resul[t] in an adverse effect on the 'terms, conditions, or benefits' of employment." *See id.* at 2410 (citing *White v. Burlington N. & Sante Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004); *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001); *Robinson v. Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). Other circuits, such as the Fifth and the Eighth Circuits, adopted an even more restrictive approach employing an "ultimate employment decisio[n] standard, which limited actionable retaliatory conduct to acts "'such as hiring, granting leave, discharging, promoting, and compensating.'" *Id.* (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997); *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997)). In contrast, the Seventh and D.C. Circuits required the plaintiff to show that the "'employer's challenged action would have been material to a reasonable employee,'" which essentially means that it would have likely "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 2410-11. (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1217-1218 (D.C. Cir. 2006)). Finally, the Ninth Circuit, in accord with EEOC guidance, required the plaintiff to merely establish "'adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'" *Id.* at 2411 (quoting *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000). The majority opinion, authored by Justice Breyer, agreed with the formulation

employed by the Seventh and D.C. Circuits.  Thus, in the Court's view, the anti-retaliation provision, unlike the substantive provision of Title VII, is not limited to discriminatory actions that affect the terms and conditions of employment.  Rather,

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Rochon*, 438 F.3d at 1219 (quoting *Washington*, 420 F.3d at 662.

*Id.* at 2412-13.  Consequently, based on the Court's guidance in *White*, Podkovich does not have to demonstrate a link between the challenged retaliatory action and the terms, conditions or status of employment.  Rather, pursuant to the Court's pronouncement in *White*, she can rely on retaliatory acts and/or harms that extend beyond workplace-related or employment-related retaliatory acts and harm.  *Id.* at 2414 ("The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm).

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to offer a non-retaliatory reason for alleged retaliation, and if the employer does so, the plaintiff must show that the proffered reason is a pretext for retaliation. *Elisero*, 398 F.3d at 1078-79; *Kratzer*, 398 F.3d at 1048 ("Once the prima facie case is made, [the employer] must articulate a legitimate, nondiscriminatory reason for its actions," and if the employer does so, then "[t]he burden shifts to [the employee] to establish that the alleged legitimate, nondiscriminatory reason for [adverse action] was a pretext.").  As to pretext, the question is whether a reasonable jury could find the defendant's explanation to be a mere pretext for retaliation in light of the evidence presented.  *Elisero*, 398 F.3d at 1078-79.  Here, however, Glazer's argues first that

Podkovich's retaliation claims under Title VII and the ICRC must fail because she cannot establish the elements of a prima facie case because she has failed to show causation.

### a.  *Prima facie case and causation*

Neither the first, nor the second element of Podkovich's case is highly contested in the defendants' Motion for Summary Judgment. First, it is clear she engaged in a protected activity because she lodged a complaint to her supervisors regarding Wanderscheid's sexually-charged emails. In addition, while it is common knowledge that "not everything that makes an employee unhappy is an actionable adverse action,"*see Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997), here, Podkovich was discharged—an unequivocal and obvious instance of an adverse employment action. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) ("Typically, it is obvious whether an employer took adverse employment action when, for example, the employee has been terminated or discharged."). Thus, the only contested element of her prima facie case is the third element, that of causation. As was the case in Podkovich's FMLA retaliation claim, the kind of causal connection required is a showing that an employer's retaliatory motive played a role in the adverse employment action. *Dewey v. Chertoff*, 416 F. Supp. 2d 661, 675 (N.D. Iowa 2006).

While this court held, with respect to Podkovich's FMLA retaliation claim, that the "very close" proximity between the end of the plaintiff's FMLA leave and her termination—indeed, just days—did give rise to an inference of causal connection, and hence, retaliatory intent, there is no such "very close" proximity here—where the allegedly retaliatory termination on November 12, 2003, came almost one year after Podkovich notified Glazer's of her claim of sexual harassment sometime in September of 2002. Thus, at first blush, any causal nexus appears to be somewhat diluted. *See Shanklin v.*

*Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) ("[W]ith . . . lengthy delay, any causal nexus inference tends to evaporate."). However, even in cases where there is a lengthy passage of time, where there is a reasonable explanation for the lapse of time, a causal connection may still be inferred. *See King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (court found two-month lapse between protected activity and the alleged retaliation was not excessive because the employer indicated its intent not to terminate the employee before the end of the academic year). Here, Podkovich contends, and this court again agrees, that additional evidence provides the necessary causal link in order to survive the defendants' Motion for Summary Judgment. This link is established, according to Podkovich, by virtue of the threat communicated to her following her report of sexual harassment. Taking the facts in a light most favorable to Podkovich, Howell told Podkovich that if word ever got out why Wanderscheid was no longer an employee at Glazer's, she would be fired, no questions asked. This same threat was reiterated to Podkovich by Rubida, Wanderscheid's supervisor and the individual to whom Podkovich first launched her complaint. Additionally, a similar threat was issued to Podkovich's boyfriend, who was, at the time, also employed at Glazer's. Following her report, Podkovich contends she was treated in a negative manner, and that this treatment continued while she was out on leave months later. On the day Podkovich was ultimately terminated by Howell, who was one of the individuals who threatened to terminate her if word about Wanderscheid's resignation became known to other employees, Podkovich learned that a Sioux City employee reported to her boyfriend that it had indeed become common knowledge that Wanderscheid left the company due to Podkovich's complaint of sexual harassment. These facts create an inference of a causal connection between Podkovich's complaints about sexual harassment and her termination and adequately explain the lapse of time in between Podkovich's complaint of sexual harassment and the adverse action. While the incidents

could later be determined to be completely coincidental and unrelated, this determination is more appropriately made by a reasonable fact finder who has heard all the evidence. Accordingly, at this juncture, these facts are sufficient to raise a genuine issue of material fact and consequently, summary judgment is not warranted on this ground.

### b. Pretext

Glazer's again contends that it has stated a legitimate, nondiscriminatory reason for terminating Podkovich—the elimination of her position due to the Diageo contract. As mentioned previously, this reason is sufficient to meet the defendants' exceedingly light burden. "If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual." *Smith,* 302 F.3d at 833. The employee shows pretext by establishing that the employer's "justification for the [adverse action] was unworthy of credence." *Id.* at 833-34. As the Eighth Circuit has recently stated, "[i]f the employee presents strong evidence of a prima facie case, then such evidence may establish pretext." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 867 (8th Cir. 2006) (citing *Smith*, 302 F.3d at 834). Moreover, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves,* 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 255 n. 10). Again, this court finds that sufficient evidence exists to support a finding of pretext for Glazer's proffered justification for terminating Podkovich. In addition to the strength of Podkovich's prima facie case, which, if proved, undeniably would be sufficient to demonstrate an animus toward Podkovich for making a complaint, it still remains, as was the case with Podkovich's FMLA retaliation claim, that Glazer's purported nondiscriminatory reason is unsound and

supports a finding of pretext. This is so, primarily based on the fact that Podkovich's termination did not even remotely coincide with the Diageo contract finalization, which had occurred two months prior to the date Podkovich was terminated. Lending further credence to this conclusion are Glazer's inconsistent and varying explanations for Podkovich's termination. Consequently, finding that Podkovich has asserted facts sufficient to sustain her burden under *McDonnell Douglas*, the court denies the defendants' Motion for Summary Judgment with respect to this ground as well.

## F. Podkovich's Pregnancy Discrimination Claim

Congress amended Title VII in 1978 with the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k) *et seq.,* and clarified that the phrase "because of sex" encompasses "pregnancy, childbirth, or related medical conditions." The purpose of the amendment was to ensure that "women affected by pregnancy, childbirth, or related medical conditions [are] treated the same for all employment-related purposes." *Id.; see also Lang v. Star Herald,* 107 F.3d 1308, 1311 (8th Cir. 1997) (explaining the expansion of Title VII to cover pregnancy discrimination). Plaintiffs can establish employment discrimination under Title VII using the direct evidence framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), or the circumstantial evidence framework set forth in *McDonnell Douglas. See Gagnon v. Sprint Corp.,* 284 F.3d 839, 845, 847-48 (8th Cir. 2002); *Wensel v. State Farm Mut. Auto. Ins. Co.*, 218 F. Supp. 2d 1047, 1056 (N.D. Iowa 2002). "Like any Title VII case, a pregnancy discrimination claim in which the plaintiff does not claim to have direct evidence of the discrimination is analyzed under the *McDonnell Douglas* evidentiary framework." *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002). Thus, because Podkovich's claim rests upon

indirect evidence, the court must apply the *McDonnell Douglas* burden shifting regime to the plaintiff's claims.

### 1.    *Prima facie case and causation*

As discussed at length in previous portions of this opinion, albeit in varied contexts, under the *McDonnell Douglas* evidentiary framework, the plaintiff is first required to establish a prima facie case of discrimination.    To establish a prima facie case of pregnancy discrimination, the plaintiff is required to show "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000); *see Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir. 1998) (setting forth elements of prima facie case of pregnancy discrimination (citing *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)).    As in their previous arguments, the only element seriously challenged in the defendants' Motion for Summary Judgment, with respect to Podkovich's prima facie case, is the fourth element—that is, "evidence from which a reasonable jury could infer that there was a nexus between her pregnancy and the discharge." *Prebilich-Holland*, 297 F.3d at 443.    Predictably, Podkovich likewise asserts a similar counterargument and contends that because the adverse employment actions followed close on the heels of her pregnancy and leave, causation has been established by virtue of temporal proximity.

Before proceeding with the analysis of the parties' respective arguments, however, the court feels compelled to comment further on both the plaintiff's and the defendants' constrained view of the law.    Both of the parties seem to assume, at least in this court's view, that the only adverse employment action at issue in this case is Podkovich's eventual

termination. However, this court must point out that such a limited view is inaccurate because "actions short of termination may constitute an adverse employment action within the meaning of [42 U.S.C. § 2000e-3(a)], *Kim*, 123 F.3d at 1060. Rather, the challenged action must result in an adverse effect on the terms, conditions or benefits of employment. *See* 42 U.S.C. § 2000e-2(a). Thus, Podkovich can rely on myriad facts contained in the record that tend to demonstrate adverse employment actions on behalf of the defendants. For example, Podkovich contends that, after learning she was pregnant, Coffman wrote her up on three separate occasions. Prior to her pregnancy, Podkovich had never received a written performance admonishment. Further, Podkovich contends Coffman began treating her differently. For instance, the record contains evidence that he did not assist her with tasks he had previously helped her with and that Podkovich was forced to do two store resets entirely on her own, which according to Podkovich, was most atypical. Finally, Podkovich contends that while she was on leave for her pregnancy, even though she was told to call in on a weekly basis to touch base with Coffman, he refused to take or return her calls, thus causing confusion and difficulty with Podkovich's anticipated return to work. All of these facts, if proved, are sufficient to constitute adverse employment actions, either taken separately or in concert.

The reason the court deems it imperative to point these facts out, is that they lend further credence to the plaintiff's temporal proximity argument with respect to causation. If the plaintiff were forced to rely on the temporal proximity between her pregnancy and only her ultimate discharge, the fact that the plaintiff's discharge occurred *after* she had given birth to her son, somewhat tempers any inference of causation. However, when looking at the entire sequence of events, again in a light most favorable to the plaintiff, it is with little difficulty the court concludes the plaintiff has met her burden. All of the previously described adverse employment actions happened shortly after Coffman and

Glazer's learned of Podkovich's pregnancy. The adverse actions continued up until and throughout the time Podkovich went on pregnancy leave. Finally, when she returned from leave, the entire sequence of events culminated in her eventual termination. The timing of these events and the fact that they purportedly only happened after Glazer's learned of Podkovich's pregnancy, are sufficient to satisfy the nexus requirement for purposes of establishing a prima facie case of pregnancy discrimination. For all these reasons, the defendants' argument, in this aspect, must fail.

### 2. *Pretext*

Once again, because Podkovich has established a prima facie case, the burden shifts to the defendants to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. Because the defendants' argument with respect to what qualifies as an adverse employment action is limited to Podkovich's termination, they again rely on the fact that her position was eliminated by the Diageo contract. While this may be a legitimate reason, at least with respect to Podkovich's termination, the defendants fail to proffer any legitimate, non-discriminatory reason for Coffman's purported adverse treatment toward Podkovich. Thus, it is clear the defendants have not met their burden with respect to these actions because Coffman's poor treatment of Podkovich occurred long before the contract with Diageo was finalized, and Podkovich is, therefore, not required to assert evidence of pretext.

With respect to the adverse action of Podkovich's termination, however, the fact that her position was allegedly eliminated does constitute a legitimate, non-discriminatory reason. However, when viewed in light of the totality of the circumstances beginning with Coffman's adverse treatment, this court finds the plaintiff has adequately demonstrated pretext in order to survive the defendants' motion. This is particularly true in light of the

fact that Coffman made representations to Podkovich that she needed to be available during Glazer's critical sales period, and shortly after she was not available during this time because of her pregnancy complications, she was terminated when she attempted to return to work. These facts, again taken in a light most favorable to Podkovich, are sufficient to undermine the credibility of the defendants' proffered reason for Podkovich's termination and tend to show that the Diageo contract did not actually motivate Glazer's decision to terminate Podkovich. For these reasons, the defendants' Motion for Summary Judgment fails on this ground as well.

## III. CONCLUSION

The court has addressed each argument set forth in the defendants' Motion for Summary Judgment and found no basis for a decision in the defendants' favor. Consequently, the defendants' Motion for Summary Judgment is **denied in its entirety**.

**IT IS SO ORDERED.**

**DATED** this 10th day of August, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA